**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARLANXEO CANADA INC.,** | : | |
| **Plaintiff** | : | **No. 1:21-cv-01843** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **KAYDON RING & SEAL, INC.,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Plaintiff Arlanxeo Canada Inc. ("Plaintiff" or "Arlanxeo") sued Defendant Kaydon Ring & Seal, Inc. ("Defendant" or "Kaydon") for breach of contract, breach of warranty, and negligence arising from the parties' business relationship. (Doc. No. 1.) Before the Court is Defendant's motion for summary judgment. (Doc. No. 63.) For the following reasons, the Court will deny the motion.

## I. BACKGROUND

### A. Procedural Background

On October 29, 2021, Arlanxeo filed a complaint asserting three claims: breach of contract (Count I); breach of warranty (Count II); and negligence (Count III). (Doc. No. 1.) Kaydon filed its answer on January 22, 2022. (Doc. No. 6.) After a case management conference, the Court set a close of fact discovery date of September 30, 2022. (Doc. No. 12.) The parties stipulated to multiple extensions of time to complete fact discovery (Doc. Nos. 14, 21, 23, 27, 29), and the deadline was ultimately extended to July 31, 2023 (Doc. No. 32). The Court conducted a post-fact discovery status conference on August 17, 2023, and set a close of expert discovery date of March 1, 2024. (Doc. No. 35.) After a post-expert discovery conference on April 11, 2024, the Court set a Daubert motion deadline of May 23, 2024. (Doc. No. 39.) The parties each filed and briefed Daubert motions, and on March 31, 2025, the Court

issued a Memorandum and Order denying the parties' motions. (Doc. Nos. 58, 59.) On May 14, 2025, Kaydon filed the instant motion for summary judgment. (Doc. No. 63.) Kaydon also filed a statement of undisputed material facts (Doc. No. 64), exhibits (Doc. Nos. 63-2–63-61, 65-1–65-21), and a brief in support of its motion (Doc. No. 68). Arlanxeo filed its brief in opposition to Kaydon's motion for summary judgment (Doc. No. 73), a responsive statement of material facts (Doc. No. 71), and exhibits (Doc. Nos. 71-1–71-27, 74-1–74-40). Kaydon filed its reply brief on August 6, 2025. (Doc. No. 79.) The parties also filed motions to file exhibits under seal (Doc. Nos. 62, 72), which the Court denied on November 6, 2025 (Doc. Nos. 80, 81). Kaydon's motion for summary judgment is fully briefed and ripe for disposition.

### B. Factual Background[1]

Arlanxeo, a wholly-owned subsidiary of Saudi Aramco, operates a butyl rubber manufacturing facility in Sarnia, Canada. (Doc. No. 64 ¶¶ 1, 18.) The manufacturing facility uses several compressors in the manufacturing process, two of which—the C2 and C3 refrigeration compressors—are at issue here. (Id. ¶ 2.) The parties dispute how to characterize the compressors, but agree that they include a rotor that spins at a high rate of speed: up to at least 7,500 rotations per minute for the C2 compressor and 6,800 for the C3 compressor. (Id. ¶ 3, Doc. No. 71 ¶ 3.) The compressors were manufactured in or around 1980 by Delaval, a predecessor company to Siemens. (Id. ¶ 4.) At that time, Delaval "engaged Kaydon to design and manufacture mechanical oil seals to be used in the Compressors." (Id. ¶ 6.) Kaydon asserts that "Kaydon's Seal was designed in approximately 1981." (Id.) Arlanxeo admits that Kaydon

[1] The following relevant facts of record are taken from Kaydon's statement of material facts (Doc. No. 64) ("SMF") and Arlanxeo's response to Kaydon's statement of material facts (Doc. No. 71) ("RSMF"). Each filing contains specific citations to the record at each numbered paragraph. The facts are undisputed unless otherwise noted.

originally designed its seal around this time, but disputes that the seals, as they existed at the time, are at issue here because "Kaydon has modified the seals in various ways" since then, including that it has "changed the dimension of the seals, removed a critical interference fit[,] changed its carbon supplier," "changed its material designations," and "modified the approved carbon grades." (Doc. No. 71 ¶ 6.) Kaydon, by contrast, asserts that the "Seal design has remained unchanged for the entire life of the Seals." (Doc. No. 64 ¶ 16.)

With respect to the specific seals, which were "designed for the Compressors at issue here, the seal housing is mounted on the Compressor casings while the seal shoulder fits onto the Compressor rotor." (Id. ¶ 9.)[2] The seals previously used a chrome plating on the shoulder but later this was changed to a tungsten carbide. (Id.)[3] The Kaydon seal "prevents process gas from leaking to the atmosphere by establishing a region of pressurized buffer fluid (seal oil) with process gas on one side and atmosphere on the other side." (Id.)[4] Each compressor uses two Kaydon seals, one at the drive and one at the non-drive end. (Id. ¶ 11.) Both compressors use the same seals. (Id.) Arlanxeo also kept "several spare Kaydon Seals in its warehouses, to be used in upcoming compressor turnarounds." (Id. ¶ 13.) The parties dispute how often the seals

---

[2] Plaintiff purports to dispute this paragraph, (Doc. No. 71 ¶ 9), but Plaintiff's dispute does not deny this portion of the relevant paragraph, and thus the Court deems these asserted facts admitted. See Local Rule 56.1 (requiring that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party").

[3] The parties dispute why Kaydon changed the material from chrome plating to tungsten carbide, but not that this occurred, and the Court thus deems this admitted. (Doc. Nos. 64 ¶ 9, 71 ¶ 9.)

[4] As stated in footnote 2, supra, Plaintiff purports to dispute this paragraph, (Doc. No. 71 ¶ 9), but Plaintiff's dispute does not deny this portion of the relevant paragraph, and thus the Court deems these asserted facts admitted.

were refurbished. Kaydon asserts that seal refurbishment occurred "on a regularly-scheduled interval (approximately every 4-5 years)" for nearly the last 40 years, (id. ¶ 12), whereas Arlanxeo states that during routine maintenance of the compressors, which occurs every 4-5 years, Arlanxeo "replaces the operating seals with the seals stored in reserve[]" and will "from time to time (but not necessarily every 4-5 years) send previously operating seals to Kaydon to ensure they are in perfectly working order" (Doc. No. 71 ¶ 12). Kaydon asserts that the seals "have worked perfectly" at the Sarnia facility since their initial use at the facility in 1981, (Doc. No. 64 ¶ 10), but Arlanxeo disputes this, asserting that the "seals failed, causing the Compressors to shut down on ten (10) separate occasions between October 2019 and May 2021" (Doc. No. 71 ¶ 10).

Kaydon's principal place of business is in Hanover, Pennsylvania. (Doc. No. 64 ¶ 5.)[5] Kaydon asserts that it "designs, manufactures, repairs, and tests its seals in Pennsylvania, (id. ¶ 15), but Arlanxeo disputes this, asserting that "Kaydon designed and manufactured the seals at issue in Baltimore, Maryland" and that "between 2019 and 2020" "Kaydon inspected, repaired, refurbished, overhauled and/or tested the seals at its facilities in both Baltimore, Maryland and Hanover, Pennsylvania" but that previously "Kaydon operated exclusively from its facility in Baltimore, Maryland" (Doc. No. 71 ¶ 15). Arlanxeo further asserts that "Kaydon engages numerous vendors to assist in manufacturing component parts of the seals, and Kaydon

[5] Plaintiff admits that Defendant's principal place of business is in Hanover, Pennsylvania, but disputes in part this paragraph, asserting that Kaydon relocated its factory and operations to Pennsylvania from Baltimore, Maryland in the middle of 2020. (Doc. No. 71 ¶ 5.) Defendant, in its reply brief, states that Plaintiff "appears to misrepresent" when Defendant moved to Pennsylvania, and that prior to 2019, Defendant refurbished the seals in Maryland, but after 2019, Defendant did this work in Pennsylvania. (Doc. No. 79 at 22–23 n.6) Thus, although the parties dispute when exactly the move occurred, it is undisputed that Kaydon moved from Maryland to Pennsylvania in the 2019-2020 timeframe.

completes the manufacturing process at its facility [in Pennsylvania]." (Id.)

Kaydon asserts that the seal "design has remained unchanged for the entire life of the Seals," (Doc. No. 64 ¶ 16), which Arlanxeo disputes, asserting that "Kaydon has modified the seals in various ways," including that: "Kaydon changed the dimension of the seals, removed a critical interference fit within the seals, and changed its carbon supplier for the seals," "Kaydon has changed its material designations" from military grade to more generic materials, and Kaydon "has also modified the approved carbon grades" (Doc. No. 71 ¶ 16).

Arlanxeo manufactures butyl rubber, which it which it then sells to other entities, including "Arlanxeo Singapore and Arlanxeo Switzerland," which are "legally-distinct affiliates" that are, like Arlanxeo, "owned by Saudi Aramco." (Doc. No. 64 ¶ 19.)[6] Under a manufacturing agreement, Arlanxeo "sells to Arlanxeo Singapore and Arlanxeo Switzerland its manufactured butyl," and these entities reimburse Arlanxeo "for all of its operational costs plus a 20% profit margin." (Id.) Arlanxeo disputes the specific characterization of its business model, stating that it has a "standard international business model" whereby it manufactures rubber, which is then "sold to customers" by Arlanxeo Singapore and Arlanxeo Switzerland pursuant to a manufacturing agreement. (Doc. No. 71 ¶ 19.) Effectively, Arlanxeo asserts that "[p]roduct manufactured by [Arlanxeo] is marketed and sold by [Arlanxeo's] international affiliates," which reimburse it "for its costs, plus a profit." (Id.)

In fall 2019, Arlanxeo conducted a major overhaul of the C2 compressor and a minor

---

[6] Plaintiff disputes this paragraph, but does not specifically dispute these asserted facts, and they are therefore deemed admitted. (Doc. No. 71 ¶ 19.)

overhaul of the C3 compressor. (Doc. No. 64 ¶ 25.)[7] The parties dispute the specifics, but it is undisputed that as part of the major overhaul of the C2 compressor, it was transported off-site for work and inspection to Shelly Machine and later to Concord. (Doc. Nos. 64 ¶ 26, 71 ¶ 26.) Kaydon asserts that the base of the compressor "had to be machined to correct warpage, because it would not sit flat when reinstalled," whereas Arlanxeo asserts that during the "routine overhaul at Shelly Machine, it was discovered that the base of the compressor was not perfectly flat. Therefore, to permanently correct that issue, the Compressor was sent to Concord for machining to ensure the base of the compressor was perfectly flat." (Doc. Nos. 64 ¶ 28, 71 ¶ 28.) Arlanxeo and Siemens also replaced the rotor in the C2 compressor. (Doc. No. 64 ¶ 29.)[8]

After the 2019 overhaul, the compressors failed at the seals "with the Seals being damaged and leaking oil." (Id. ¶ 33.)[9] The seals failed ten times, eight times in the C2 compressor and twice in the C3 compressor. (Id. ¶ 34.) The parties dispute the cause of these failures—Kaydon asserts that "there were problems with the third-party installation of the Seals," whereas Arlanxeo asserts that "witnesses have concluded that defects within Kaydon's seals have caused the seals to fail." (Doc. Nos. 64 ¶¶ 35–39, 71 ¶¶ 35–39.) The parties also dispute Kaydon's responsiveness to the seal failures, but it is undisputed that Kaydon "physically

[7] Plaintiff disputes this paragraph, but does not specifically dispute these asserted facts, and they are therefore deemed admitted. (Doc. No. 71 ¶ 25.)

[8] Plaintiff disputes this paragraph, but does not specifically dispute these asserted facts, and they are therefore deemed admitted. (Doc. No. 71 ¶ 29.)

[9] Defendant asserts that prior to the overhaul, the seals had "perfect performance . . . for 37 years." (Id.) Arlanxeo disputes this, asserting that "the seals failed on numerous occasions prior to the 2019 overhauls." (Doc. No. 71 ¶ 33.)

visit[ed] Arlanxeo's Sarnia facility" after the initial failures. (Doc. No. 64 ¶ 42.)[10] After several failures, Arlanxeo shipped the C2 compressor to Siemens in Houston, Texas. (Id. ¶ 48.)[11] "The first high speed balance test in Houston showed that the Compressor was out of balance, and thus they attempted to get the Compressor in balance." (Id. ¶ 49.)[12] Kaydon asserts that Arlanxeo blamed "Siemens Canada for the failures, and negotiat[ed] a multi-million dollar settlement with Siemens," but Arlanxeo disputes this, asserting that Arlanxeo did not blame Siemens, that "Siemens did not pay ARLANXEO a single dollar under any settlement agreement," and instead "under the referenced settlement agreement, ARLANXEO paid Siemens approximately $5 million." (Doc. Nos. 64 ¶ 51, 71 ¶ 51.) Kaydon further asserts that "Arlanxeo Canada asserts now that Kaydon changed suppliers of carbon in 2016, and that the change in carbon suppliers caused the failures," but that "of the ten Kaydon Seals that failed during the Compressor failures, some included carbon from before the 2016 supplier change, and some included carbon from after the 2016 supplier change, mooting any implication from this assertion." (Doc. No. 64 ¶

[10] Kaydon asserts that it "responded immediately to the Compressor failures, over the 2019 Christmas holiday, and throughout the Covid pandemic, providing Arlanxeo with new Seals, refurbishing Seals, physically visiting Arlanxeo's Sarnia facility, and analyzing the data to assist Arlanxeo in determining the root cause of the failures." (Id.) By contrast, Arlanxeo asserts that "Kaydon repeatedly failed to provide timely assistance to ARLANXEO—with its only goal of rejecting any and all responsibility for the seal failures," that "Kaydon failed to visit the Sarnia Facility to inspect the seals for more than six weeks after the initial failures," "repeatedly delayed shipment of emergency seals to ARLANXEO following the failures," "failed to send an engineer to ARLANXEO's facility until January 2020—three months after the first failure," and "failed to implement appropriate repairs and corrective action, causing the Oil Seals to fail and the Compressors to shut down repeatedly over the course of the following two (2) years." (Doc. No. 71 ¶ 42.)

[11] Plaintiff disputes this paragraph, but does not specifically dispute these asserted facts, and they are therefore deemed admitted. (Doc. No. 71 ¶ 48.)

[12] Plaintiff admits this paragraph but asserts that "the Seals should be able to accommodate a compressor that is not perfectly balanced." (Doc. No. 71 ¶ 49.)

51.) Arlanxeo disputes this, asserting that:

> Kaydon's seals are defective and caused the failures because the bushing seal in the original Kaydon design has inherent weaknesses: (1) it is not force-balanced hydraulically, (2) it relies on or assumes perfect (i.e., "smooth" or "frictionless") surface conditions between the bushing face and the housing, (3) the carbon ring is a hard and brittle material that is unforgiving when the bushing and the shoulder rings come into contact (or impact), (4) such contact wears the shoulder and carbon surfaces, while wear debris escalate wear and degrades the surfaces further, (5) the rubbing contact (impact) is known to instigate vibrations, and (6) the chrome plated shoulder is inferior (in many aspects) to a tungsten carbide coated shoulder . . . Hence, the Kaydon bushing seal has had limited to no ability to accommodate commonly occurring shaft excursions. [] That inability led to rubbing contact at the bushing seal surfaces that caused severe wear of the entire seal assembly perpetually, and ultimately caused the seals failure.

(Doc. No. 71 ¶ 51.) Kaydon states that Arlanxeo's theory of liability is based on Kaydon's refusal "to change its Seal design to include a bushing made of a Babbitt material instead of carbon," but that "Arlanxeo did not at any time contract with Kaydon to redesign the Seals to include a Babbitt bushing or otherwise." (Doc. No. 64 ¶¶ 52–53.) Arlanxeo disputes these assertions, stating that third party experts concluded that "Kaydon should replace the chrome-plated shoulder with a tungsten carbide shoulder and replace the carbon bushing with a babbitted bushing," and that "ARLANXEO specifically requested that, through its repair and refurbishing process, Kaydon change the material of the bushing from carbon to babbitt, and to change the material of the shoulder from chrome-plated to tungsten carbide." (Doc. No. 71 ¶¶ 52–53.) Kaydon asserts that it "did offer to create a Seal with a Babbitt bushing, however, **<u>Arlanxeo refused to submit a purchase order for such a Seal</u>**," which Arlanxeo again disputes, asserting that "ARLANXEO specifically requested that, through its repair and refurbishing process, Kaydon change the material of the bushing from carbon to babbitt," but that "Kaydon did not offer to create a Seal with a babbitt bushing, and refused to offer any technical recommendation for upgrade from a carbon bushing to a babbitted bushing." (Doc. Nos. 64 ¶ 54, 71 ¶ 54.)

Arlanxeo then "engaged a competitor seal manufacturer, Flowserve, to design a seal with a Babbitt bushing for installation into the C2 compressor." (Doc. No. 64 ¶ 55.)[13] On June 2, 2021, a Flowserve seal was installed, which failed within minutes of operation, (Doc. No. 64 ¶ 56), however, Arlanxeo disputes this insofar as it asserts that the Flowserve seal was a prototype, and that later "Flowserve provided a modified version of Kaydon's Oil Seal design that utilized a bushing made of babbitt and a shoulder made of tungsten carbide," which never failed (Doc. No. 71 ¶ 56). When the initial Flowserve seal failed, the "Babbitted bushing delaminated from the seal." (Doc. No. 64 ¶ 57.) It is undisputed that, approximately twelve months later, the C2 compressor was decommissioned, the Flowserve seal was uninstalled, and Arlanxeo purchased a new compressor from Siemens. (Doc. Nos. 64 ¶¶ 59–60, 71 ¶¶ 59–60.)[14] However, Arlanxeo disputes the reason for decommissioning the compressor, asserting that "as a result of the repeated failure of Kaydon's Seals, and the resulting shutdown of the compressors, the C2 Compressor's anticipated life was significantly reduced." (Doc. No. 71 ¶ 60.)

Kaydon asserts that "[e]ach of Arlanxeo Canada's three claims is premised upon an alleged contractual relationship between the two parties, relating to five (5) specific purchase orders," which Arlanxeo disputes only to note that its "negligence claim is premised on Kaydon's extra-contractual duty to use the ordinary skill, care, and diligence." (Doc. Nos. 64 ¶ 78, 71 ¶ 78.)

The parties also dispute the specifics of the parties' exchanges with respect to the "five

---

[13] Plaintiff purports to dispute this paragraph, but does not specifically dispute these asserted facts, and they are therefore deemed admitted. (Doc. No. 71 ¶ 55.)

[14] Again, Plaintiff purports to dispute these paragraphs, but does not specifically dispute these asserted facts, and they are therefore deemed admitted.

(5) specific purchase orders" at issue (Doc. No. 64 ¶ 78), and the Court will recite the asserted facts as to each:

- First, Kaydon asserts that on May 28, 2015 it "issued to LanXess Quote No. 9162 for the repairs of seven (7) seals" (Doc. No. 64 ¶ 79), and that "LanXess then issued purchase order no. 310951036 to Kaydon dated June 5, 2015, which expressly references and incorporates Kaydon Revised Repair Quote 9162" (Id. ¶ 80).[15] Arlanxeo admits receiving the May 28, 2015 quote but asserts that this quote "references, incorporates, and was submitted in response to ARLANXEO's Purchase Order No. 310951036, which was submitted prior on May 12, 2015." (Doc. No. 71 ¶ 79.) Kaydon asserts that the "purchase order sought delivery of four (4) seals on June 29, 2015, and three (3) seals on July 9, 2015," and that "Kaydon delivered these Seals and there is no evidence that LanXess did anything but accept the refurbished Seals without issues or complaints." (Doc. No. 64 ¶¶ 80–81.) By contrast, Arlanxeo asserts that it "observed that 3 of the 4 seals were tested at 7,400 RPM, instead of the required 7,750 RPM (which is the C2 Compressor operating speed). In addition, assembly plates were missing from the seals." (Doc. No. 71 ¶ 81.)

[15] LanXess was a predecessor entity to Arlanxeo. (Doc. Nos. 64 ¶ 17, 71 ¶ 17.) Kaydon states that, "[f]irst, Polysar operated the facility with the Delaval compressors. Next, Biya Germany operated the facility until 2006. After that, a new entity was formed—LanXess—which operated the manufacturing facility. Kaydon refurbished the seals for LanXess until 2016. In 2016, LanXess and Saudi Aramco formed certain joint ventures to create new entities, including Arlanxeo Canada. In December 2018, Arlanxeo Canada became a wholly-owned subsidiary of Saudi Aramco." (Doc. No. 64 ¶ 17.) Whereas Arlanxeo states that "Kaydon designed, manufactured, and refurbished the seals for LANXESS, which changed its name to ARLANXEO in 2016." (Doc. No. 71 ¶ 17.)

- Second, Kaydon asserts that on January 14, 2016, it "issued to LanXess Quote No. 9296A for the repairs of four (4) seals. Kaydon's Quote provides for 12 weeks of lead time for delivery of each seal," and "LanXess then issued purchase order no. 311063364 to Kaydon dated January 28, 2016, which expressly references and incorporates Kaydon Quote 9296A. The purchase order sought delivery of two (2) seals on January 29, 2016, two (2) seals on February 8, 2016, one (1) assembly plate on January 24, 2016." (Doc. No. 64 ¶¶ 82–83.) Arlanxeo again asserts that Kaydon's recitation of the submission order is incomplete, and that "Kaydon's Quote references, incorporates, and was submitted in response to ARLANXEO's Purchase Order No. 311063364, which was submitted prior on December 9, 2015." (Doc. No. 71 ¶ 82.) It is undisputed that the "Seals that Kaydon refurbished and delivered in 2015 and 2016 were installed in the Compressors during the 2019 Overhaul." (Doc. No. 64 ¶ 85.)
- Third, Kaydon asserts that "on November 20, 2019, Kaydon issued to Arlanxeo Canada Quote No. 10156 for the repairs of two (2) seals," and "Arlanxeo Canada then issued purchase order no. 311911378 to Kaydon dated December 2, 2019, which expressly references and incorporates Kaydon Quote 10156. The purchase order sought delivery of two (2) seals on December 27, 2019." (Doc. No. 64 ¶¶ 86–87.) Arlanxeo counters that on "November 5, 2019, ARLANXEO issued Purchase Order No. 311911378 to Kaydon for the emergency repair of two (2) seals," and then in "response, on November 20, 2019, Kaydon issued Quote No. 10156." (Doc. No. 71 ¶ 87.) Arlanxeo asserts that, then, on "December 2, 2019, ARLANXEO issued a revised Purchase Order No. 311911378, which expressly

referenced Kaydon Quote No. 10156, and requested the "OVERHAUL" and "REPAIR" of the Seals." (Id.)

- Fourth, Kaydon asserts that "on November 20, 2019, Kaydon issued to Arlanxeo Canada Quote No. 10149A for the repair of five (5) seals," and "Arlanxeo Canada then issued purchase order no. 311908927 to Kaydon dated December 17, 2019, which expressly references and incorporates Kaydon Quote 10149A. The purchase order sought delivery of two (2) seals on February 1, 2020, two (2) seals on December 28, 2019, and one (1) seal that had already been delivered." (Doc. No. 64 ¶¶ 88–89.) Arlanxeo asserts that Kaydon had initially issued "Quote No. 10149 for the emergency repair of five (5) seals" on November 4, 2019, but then issued the updated Quote No. 10149A on November 20, 2019, and that "Kaydon's Quotes reference, incorporate, and were submitted in response to ARLANXEO Purchase Order No. 311908927, which was submitted prior on October 31, 2019." (Doc. No. 71 ¶ 88.) Arlanxeo assets that this "revised Purchase Order included additional shipping/customs information and pricing information and called for Kaydon to fully 'inspect,' 'repair,' and 'overhaul' the Seals as to be free from all defects" and that "URGENT – REPAIR – URGENT" was written in the header. (Id.)
- Fifth, Kaydon asserts that "Arlanxeo Canada then issued purchase order no. 311942876 to Kaydon dated December 23, 2019, which expressly requests that Kaydon provide a Quote for repair [] before Kaydon commences work on the four (4) ordered seals." (Doc. No. 64 ¶ 90.) Arlanxeo asserts in response that "Kaydon never provided a Quote regarding Purchase Order No. 311942876, did

not otherwise respond to the Purchase Order, and instead performed." (Doc. No. 71 ¶ 90.)

Kaydon asserts that "Arlanxeo Canada's corporate representative, Laura Faubert, confirmed that all of Arlanxeo Canada's purchase orders were based on the corresponding Kaydon quotes," which Arlanxeo disputes, stating that "in general (but not always), the Seals would be sent to Kaydon, Kaydon would generate an inspection report, and if approved, a requisition would be generated—allowing ARLANXEO to issue a Purchase Order." (Doc. Nos. 64 ¶ 91, 71 ¶ 91.)

Kaydon asserts that "[e]ach of the Kaydon Quotes submitted to Arlanxeo expressly provides that 'Kaydon's standard Terms and Conditions of Sale Apply.'" (Doc. No. 64 ¶ 94 (quoting Doc. No. 65-17 at 3).) Arlanxeo does not dispute that this language was included in Kaydon's quotes, but asserts that "Kaydon's alleged terms and conditions were never provided" to Arlanxeo.[16] (Doc. No. 71 ¶ 94.)

Kaydon cites its terms and conditions as follows:

a. "The terms and conditions of sale set forth below apply to all quotations made and purchase orders accepted by [Kaydon.]" Para. 1.

b. "[Kaydon's] delivery dates are approximate. [Kaydon] shall not be liable for delays in delivery or other defaults in performance of this order arising out of causes beyond [Kaydon's] control." Para. 5.

c. "Warranty. [Kaydon] warrants the products manufactured by it to be free from defects in material and workmanship only. The extent of [Kaydon's] obligations hereunder is to either repair or replace its work or the defective products, F.O.B. [Kaydon's] plant, if returned with twelve (12) months after date of delivery. . . . THE FOREGOING STATES THE SOLE AND

[16] In its reply brief, Kaydon states that "Arlanxeo Canada's argument that it never received Kaydon's Terms and Conditions is flatly contradicted by the many such Kaydon Terms and Conditions produced by Arlanxeo Canada itself in this litigation." (Doc. No. 79 at 29 (citing Doc. Nos. 79-2 through 79-5).)

EXCLUSIVE WARRANTY OF [ARLANXEO CANADA] AND THE SOLE AND EXCLUSIVE WARRANTY OF [KAYDON]. THE WARRANTIES STATED IN THIS PARAGRAPH ARE IN LIEU OF ALL OTHER WARRANTIES, WRITTEN OR VERBAL, STATUTORY, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY DISCLAIMED." Para. 8.

d. "Limitation of Liability. [Kaydon] shall not be responsible, obligated, or liable for any injury or damage resulting from an application or use of its products, either singly or in combination with other products. [KAYDON'S] SOLE LIABILITY FOR BREACH OF WARRANTY OR ANY OTHER CLAIM SHALL BE LIMITED TO REPAIR OR REPLACEMENT OF THE PRODUCTS OR RETURN OF THE PURCHASE PRICE, AT [KAYDON'S] SOLE OPTION. SELLER SHALL NOT BE LIABLE FOR DAMAGES, INCLUDING BUT NOT LIMITED TO CONSEQUENTIAL OR SPECIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE USE OR PERFORMANCE OF THE PRODUCTS OR ARISING OUT OF ACCEPTANCE OF THIS ORDER. [ARLANXEO CANADA] SHALL INDEMNIFY [KAYDON] AGAINST ALL LIABILITY, COST, OR EXPENSE THAT MAY BE SUSTAINED BY [KAYDON] BECAUSE OF ANY SUCH LOSS, DAMAGE, OR INJURY." Para. 9.

e. "Limitations of Actions. Irrespective of whether [Kaydon] agreed to perform start-up or any other service after the delivery of the product, all claims or actions must be brought within one (1) year of date of tender of delivery, or eighteen (18) months of [Arlanxeo Canada's] order, if no tender of delivery is made, notwithstanding any statutory period of limitation to the contrary." Para. 13.

f. "Reasonable Attorney's Fees. In the event suit or other proceeding shall be brought for the recovery of the purchase price, or any unpaid balance or the breach by [Arlanxeo Canada] of any term of the agreement between [Kaydon] and [Arlanxeo Canada], [Arlanxeo Canada] shall pay to [Kaydon] in addition to any damages provided by law, reasonable attorney's fees and costs of collection." Para. 17.

g. "The agreement between [Kaydon] and [Arlanxeo Canada] and matter connected with the performance thereof shall be construed in accordance with and governed by the law of the State of Michigan, without regard to its conflict of laws principles. The provisions of the 1980 United Nations Convention on Contracts shall not govern the rights and obligations of the parties in connection with this Purchase Order for the goods delivered for the International Sale of Goods." Para 20.a.

h. "Any assignment of the agreement between [Kaydon] and [Arlanxeo Canada] or any rights or obligation of the agreement by [Arlanxeo Canada] without written consent of [Kaydon] shall be void." Para. 20.b.

i. "Except as may be expressly provided to the contrary in writing, the provisions of the agreement between [Kaydon] and [Arlanxeo Canada] are for the benefit of the parties hereto and not for any other person." Para. 20.c.

j. "No amendment, addition to, alteration, modification or waiver of all or part of the agreement between [Kaydon] and [Arlanxeo Canada] shall be of any force or effect unless in writing and signed by [Arlanxeo Canada]. If the terms and conditions set forth above conflict with those of any purchase order of [Arlanxeo Canada] written in connection with the sale of the products or any portion thereof, then the terms set forth above shall govern." Para. 20.g.

k. "Entire Contract. THE TERMS AND CONDITIONS SET FORTH HEREIN CONSTITUTE THE EXPRESSION OF ALL THE TERMS OF THIS AGREEMENT AND A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN [ARLANXEO CANADA] AND [KAYDON]. ALL REPRESENTATIONS, PROMISES, WARRANTIES OR STATEMENTS BY ANY AGENT OR EMPLOYEE OF [KAYDON] THAT DIFFER IN ANY WAY FROM THE TERMS AND CONDITIONS HEREIN SHALL BE GIVEN NO EFFECT OR FORCE." Para. 21.

(Doc. No. 64 ¶ 94.)

Arlanxeo does not dispute the language of Kaydon's terms and conditions, but asserts that they "do not apply to the transactions at issue." (Doc. No. 71 ¶ 94.) Instead, Arlanxeo asserts that "ARLANXEO's terms and conditions—which were attached to each and every Purchase Order at issue in this action and actually received by Kaydon—control the contractual relationship." Arlanxeo cites the corresponding portions of its terms and conditions as follows:

a. Seller shall indicate its acceptance of this Order by verbal acceptance, by written acknowledgement or acceptance on the face of this order or other written confirmation, by commencing work on this Order in any manner, or by delivering any of the Goods or performing any of the Work. Any such act by Seller shall constitute acceptance of this Order. These terms and conditions shall apply to all Goods supplied and Work performed under this

Order, and this Order **shall constitute the whole contract** between the parties and no modification or variation thereof, including trade customs or any condition or reservation contained in any communication, oral, or written, received from Seller, shall be of any effect unless in writing signed by both Buyer and Seller.

b. Time shall be of the essence of the contract resulting from this Order. The Goods must be delivered and the Work must be performed strictly in the quantities, on the delivery dates and in the manner specified.

c. Seller expressly warrants that title to the Goods supplied and Work performed under this Order is free and clear of all liens and encumbrances and that all Goods supplied and Work performed under this Order will conform to the Specifications, drawings, samples, or other description furnished to or by Buyer, will be fit and sufficient for the purpose intended, will contain no contaminants, and will be of good material and workmanship and free from defect.

d. Failure of Seller to perform or comply with any provision of this Order shall entitle Buyer to cancel this Order in whole or in part and/or reject the Goods or Work or any part thereof within a reasonable time after delivery or performance or to retain the Goods or the Work or any part thereof, subject to a **right to compensation for damages for such failure**.

. . .

g. The contract resulting from this Order shall be governed by and interpreted in accordance with the law applicable in the Province of Ontario, but expressly excluding the United Nations Convention on Contracts for the International Sale of Goods."

(Doc. No. 71 ¶ 94.)

It is undisputed that "Arlanxeo Canada paid Kaydon for its services with respect to the Seals that were refurbished and delivered pursuant to the Purchase Orders." (Doc. No. 64 ¶ 95.) Although Kaydon asserts that the "Kaydon Quotes and Arlanxeo Canada Purchase Orders at issue in this case [] were simply for the 'repair' of the Kaydon Seals, and nothing more," Arlanxeo disputes this characterization, asserting that "Kaydon's work subject to this litigation included complete seal overhauls, seal inspections and assessments, field services, seal

repairs/refurbishments, and to identify and remedy the cause of the seal failures." (Doc. Nos. 64 ¶ 96, 71 ¶ 96.)

Bradley Wolf, an expert witness for Arlanxeo, asserts that Arlanxeo incurred $39 million in damages resulting from the present dispute, of which he calculated $31 million in lost profits and $8 million in investigatory and repair expenditures and other costs, including demurrage and utilities. (Id. ¶¶ 97–98.) The parties dispute the damages calculation, with Kaydon asserting that "Wolf calculated the lost profits of entirely distinct and separate foreign non-party entities—Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil, and Arlanxeo USA." (Id. ¶ 102.) Arlanxeo asserts instead that it has "a standard international business model: ARLANXEO manufacturers rubber, which is then sold to customers by two of ARLANXEO's affiliate entities—ARLANXEO Singapore and ARLANXEO Switzerland—pursuant to a Butyl Manufacturing Agreement." (Doc. No. 71 ¶ 102.) It is undisputed that Arlanxeo, Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil, and Arlanxeo USA are each legally distinct entities that share common ownership. (Id. ¶ 103.) Kaydon asserts that "Arlanxeo Canada's damages expert confirmed that all of [the] costs incurred by Arlanxeo Canada have already been reimbursed by Arlanxeo Singapore and Arlanxeo Switzerland," (Doc. No. 64 ¶ 106), which Arlanxeo disputes, stating that "ARLANXEO Canada entered into a settlement agreement pursuant to which its corporate affiliates were compensated for the losses they suffered as a result of the production outages and lack of supply caused by Kaydon's Seal failures" (Doc. No. 71 ¶ 106). "Arlanxeo Canada purportedly entered into an Assignment Agreement with Arlanxeo Singapore and Arlanxeo Switzerland, in June 2023, several years after the filing of the Complaint," which provides that "Arlanxeo Singapore and Arlanxeo Switzerland assign [to Arlanxeo Canada] all interest in and to []claims against Kaydon arising from [Kaydon's]

wrongful conduct." (Doc. No. 64 ¶¶ 108–09 (internal quotations omitted).) Arlanxeo has not entered into an assignment agreement with Arlanxeo Brazil or Arlanxeo USA in connection with Kaydon. (Id. ¶ 115.) Kaydon has not entered into any contracts with Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil, or Arlanxeo USA for the manufacture, sale, repair, refurbishment, or delivery of mechanical oil seals. (Id. ¶ 112.) Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil, and Arlanxeo USA "were not end-users of Kaydon's Seals," only "Arlanxeo Canada was an end user of Kaydon's Seals." (Id. ¶ 121.) Nor does the complaint mention "Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil, or Arlanxeo USA," and "the damages sought in the Complaint are for Arlanxeo Canada's 'actual damages [and] consequential damages'—with no reference to damages to any other entity." (Id. ¶¶ 110–11.)[17] Additionally, the "Quotes and Purchase Orders at issue in this case do not reference Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil or Arlanxeo USA." (Id. ¶ 113.)[18] "At the time that Kaydon initially designed the seals at issue in this case, Arlanxeo Singapore, Arlanxeo Switzerland, Arlanxeo Brazil, and Arlanxeo USA did not exist." (Id. ¶ 117.)[19]

---

[17] Plaintiff does not assert that the complaint mentions these affiliate entities, but disputes these paragraphs insofar as it asserts the legal argument that "ARLANXEO is entitled to recover the ARLANXEO Singapore and ARLANXEO Switzerland damages (1) pursuant to the transferred loss principle and (2) by application of the principle that amounts paid as a settlement as a result of a breach of contract constitute damages for that breach of contract." (Doc. No. 71 ¶ 110.) Arlanxeo further asserts that "Kaydon's breach of the Purchase Orders caused ARLANXEO to breach its obligations under its Butyl Manufacturing Agreement with ARLANXEO Singapore and ARLANXEO Switzerland, which resulted in ARLANXEO agreeing to compensate its affiliates for their losses." (Id.)

[18] Plaintiff again purports to dispute this paragraph without controverting the asserted facts. The facts will be deemed admitted.

[19] Plaintiff purports to dispute this paragraph without controverting the asserted facts. The facts will be deemed admitted.

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. See id. at 251–52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. See Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the

non-movant's evidence is merely colorable, conclusory, or speculative. See Anderson, 477 U.S. at 249–50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Furthermore, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III. DISCUSSION

### A. Choice of Law Analysis

Before turning to the merits of Kaydon's motion, the Court addresses the parties' dispute over which body of law applies to Plaintiff's breach of contract, breach of warranty, and negligence claims. Kaydon argues that Pennsylvania law applies (Doc. No. 68 at 19), whereas Arlanxeo asserts that the applicable law is that of Ontario, Canada (Doc. No. 71 at 23).

A court exercising diversity jurisdiction applies the forum state's choice of law rules. See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226 (3d Cir. 2007) (stating that, "[b]ecause this is a diversity case, we apply the choice-of law-rules of the forum state, Pennsylvania"). Under Pennsylvania choice-of-law rules, "the first question to be answered in addressing a potential conflict of laws dispute is whether the parties explicitly or implicitly have chosen the relevant law." See Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 164 (3d Cir. 1999). "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994). "If the parties have not agreed upon a choice of law, Pennsylvania employs a two-step process to resolve choice-of-law questions." Atl. Pier Assocs., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 486 (E.D. Pa. 2009).

The Court "must first determine whether there is a true conflict between the relevant laws of" the two jurisdictions. See Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 230 (3d Cir. 2010). "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." Hammersmith, 480 F.3d at 230 (emphasis in original). "A false conflict exists where only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996). "When a false conflict exists, courts apply the law of the only interested jurisdiction." Broederdorf v. Bacheler, 129 F. Supp. 3d 182, 193 (E.D. Pa. 2015). "A deeper choice of law analysis is necessary only if both jurisdictions' interests would be impaired by the application of the other's laws." Hammersmith, 480 F.3d at 230 (emphasis in original) (cleaned up). If "a true conflict exists, the Court must then determine which state has the greater interest in the application of its law," which requires "weigh[ing] the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue." See id. (internal quotations omitted); see also Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 229 (3d Cir. 2010) (internal quotations omitted) (stating that "Pennsylvania applies a flexible rule which permits analysis of the policies and interests underlying the particular issue before the court and directs courts to apply the law of the state with the most interest in the problem"). This flexible "interest/contacts" methodology applies when evaluating the law to apply to tort claims and to contract claims. See Hammersmith, 480 F.3d at 226–27. "Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case." Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).

For breach of contract claims, the relevant factors to weigh include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the

location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." See Specialty Surfaces Int'l, Inc., 609 F.3d at 233–34 (quoting Restatement (Second) of Conflict of Laws § 188(2)). For tort claims, courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." See Trias v. QVC, Inc., 498 F. Supp. 3d 614, 620–21 (E.D. Pa. 2020) (quoting Restatement (Second) of Conflict of Laws § 145 (1971)).

As noted supra, Defendant asserts that Pennsylvania law applies to each claim. (Doc. No. 68 at 19.) Defendant notes that its terms and conditions included a Michigan choice-of-law provision, (Doc. No. 64 ¶ 94), but argues that, under Pennsylvania conflict of law rules, Pennsylvania law applies to this dispute. Defendant correctly notes that under Pennsylvania choice-of-law rules the first question is typically "whether the parties explicitly or implicitly have chosen the relevant law," but states that, because "the parties have both expressly included choice of law provisions" that "do not match," "this case presents a unique difficulty in adhering to [the question of whether the parties have chosen the relevant law.]" (Doc. No. 68 at 21 n.3.) Defendant asserts further that Pennsylvania and Michigan are generally aligned in their interpretation of contract and tort claims—both states "have adopted the UCC, which governs the breach of contract and breach of warranty claims," and "[t]here are also no outcome-determinative differences between Michigan and Pennsylvania implicated in Plaintiff's negligence claim"—and thus, under Hammersmith, there is no conflict between the law of the two states. (Id. at 20 n.2.) Defendant therefore asserts that, "because the parties have exchanged multiple forms that have differing choice of law provisions," "[i]n the absence of an enforceable

choice of law provision . . . Pennsylvania law applies." (Id.) Defendant asserts that there is a "real conflict in the applicable law between Ontario and Pennsylvania" as to each claim, and that Pennsylvania law applies to all three claims. (Id. at 23.) As to the breach of contract and breach of warranty claims, Kaydon asserts that "Pennsylvania has adopted the [Uniform Commercial Code] for the purpose of streamlining dealings and disputes," whereas "Ontario has no equivalent." (Id. at 24.) Further, "Pennsylvania and Ontario differ on the recoverability of damages for breach of contract." (Id. at 25.)[20] Regarding the negligence claim, Kaydon argues that there is a real conflict because Kaydon asserts that, under Pennsylvania law, the negligence claim is "barred by gist of the action and economic loss doctrine," but, although "Ontario law recognizes a similar doctrine, Canadian courts nonetheless permit recovery if the alleged damages fall into a recognized category of recoverable loss." (Id. at 28.) Defendant asserts that this presents a false conflict, because Pennsylvania's "interests would be harmed by Ontario's lack of similar doctrines [to the gist of the action and economic loss doctrines], and so . . . Pennsylvania law is appropriate." (Id. at 30.)

Defendant also argues that application of the contacts and interests analysis dictates that Pennsylvania law should apply to each claim. As relevant to the contract and warranty claims, Kaydon asserts that "the seals were manufactured, tested and repaired in Pennsylvania, and shipped from the same," and "Kaydon's principal place of business is located in Hanover, Pennsylvania, where it operates and from where it sent quotes to Arlanxeo." (Id. at 27.) As to

[20] As discussed in more detail, infra, the difference in damages that would potentially be available under Ontario law is a critical component of Arlanxeo's claim—Arlanxeo asserts that two doctrines, the "principle of transferred loss," and the "settlement doctrine" permit it, under Ontario law, to recover damages from Kaydon pursuant to losses incurred by its affiliated entities. See (Doc. No. 73 at 38–43).

the negligence claim, Kaydon asserts that its principal place of business is Pennsylvania, "the seals were allegedly negligently designed, manufactured, and repaired in Pennsylvania, therefore the alleged negligent conduct took place in Pennsylvania," and "Ontario has virtually no interest in Arlanxeo Canada's tort claims, as the real alleged injury—and any associated losses—were incurred not by Arlanxeo Canada but by the Foreign Non-Party Entities." (Id. at 30–31.)

Plaintiff argues in response that Ontario law applies to each claim. (Doc. No. 73 at 23.) Plaintiff asserts that Defendant's argument that Pennsylvania law applies "has no merit because there is no conflict of laws" given that "no party ever intended for Pennsylvania law to apply to this case as the parties sent numerous contractual documents and ***none of them contain a choice of law provision selecting Pennsylvania law***," whereas Plaintiff "sent Kaydon five Purchase Orders with enforceable Ontario law provisions." (Id.) (emphasis in original). Arlanxeo argues that, "even if these express Ontario law provisions did not exist, Ontario is still the governing law because of the substantial connection between Ontario and the parties and transactions in issue." (Id.)

As to Kaydon's assertion that it sent terms with a Michigan choice of law provision, Arlanxeo asserts that it "never received these alleged terms and conditions." (Id. at 24.) Even if it had, Arlanxeo argues that the "provision is unenforceable because the State of Michigan has no relationship whatsoever to this case." (Id. at 27.) Alternatively, Plaintiff argues that under the Pennsylvania contacts and interests analysis, Ontario law governs. Plaintiff states that, as to the breach of contract and warranty claims, the "place of contracting; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the Plaintiff are all Ontario." (Id. at 29–30.) As for the negligence claim, Plaintiff asserts that its "place of business, the conduct leading to the injury,

and the relationship between the parties all favor Ontario." (Id. at 31.) Plaintiff claims that, contrary to Defendant's assertions regarding Pennsylvania's ties for purposes of the present analysis, "Kaydon exclusively manufactured, tested, repaired and shipped a great number of the Seals at issue in and from Baltimore, Maryland" instead. (Id. at 30 n.3.)

Plaintiff further argues—separately from its arguments with respect to the other four purchase orders—that it is "indisputable that Ontario law governs" the parties' dispute with respect to Purchase Order No. 311942876 because "there is no responsive Kaydon Quote—Kaydon simply proceeded to attempt performance in accordance with the terms" of that purchase order, which contained [the above-cited] Ontario choice-of-law provision. (Id. at 24.)

In reply, Defendant asserts that "Arlanxeo Canada's argument that it never received Kaydon's alleged terms and conditions is simply false (and puzzling)—as Arlanxeo Canada's very own documents demonstrate that it received and possessed Kaydon's Terms and Conditions on many occasions," and Arlanxeo "produced Kaydon's Terms and Conditions during discovery, making clear they've always had them." (Doc. No. 79 at 17 (citing Doc. Nos. 79-2 through 79-5).) As to Arlanxeo's argument that the Michigan choice of law provision is unenforceable—and therefore that there was only one valid choice of law provision—Kaydon argues that "federal courts in Pennsylvania enforce choice of law provisions where a party was headquartered in that state at the time the agreements or business relationships were established," and that "Kaydon was founded in Muskegon, Michigan, where it was headquartered until at least 2015." (Id. at 19–20.) Kaydon asserts further that it first contracted with Arlanxeo's predecessor entities in 1981, while it was headquartered in Michigan. (Id.) Regardless, though, Kaydon argues that, because the parties had conflicting provisions, "there was no explicit or implicit intent or agreement that Ontario law would provide." (Id.) Defendant also argues that Plaintiff

misrepresents the facts regarding Purchase Order No. 311942876 and that "Arlanxeo Canada's [procurement manager Laura] Faubert confirmed that [there was a] new Arlanxeo Canada purchase order replacing No. 311942876," due to an upgrade in Arlanxeo's "SAP system"—"Purchase Order No. 1000672." (Doc. No. 79 at 15–16.)

Upon careful consideration of the parties' briefs, the evidence of record, and the applicable law, the Court finds that Ontario law applies to each of Plaintiff's claims. The first question is "whether the parties explicitly or implicitly have chosen the relevant law." See Clover, 195 F.3d at 164. Defendant asserts that, through its terms and conditions, it chose Michigan law, whereas Plaintiff asserts that, in accordance with its own terms and conditions, Ontario law governs. (Doc. Nos. 64 ¶ 94, 71 ¶ 94.) Kaydon's provision states that:

> The agreement between [Kaydon] and [Arlanxeo Canada] and matter connected with the performance thereof shall be construed in accordance with and governed by the law of the State of Michigan, without regard to its conflict of laws principles. The provisions of the 1980 United Nations Convention on Contracts shall not govern the rights and obligations of the parties in connection with this Purchase Order for the goods delivered for the International Sale of Goods.

(Doc. No. 64 ¶ 94.) However, Arlanxeo's provision states that:

> The contract resulting from this Order shall be governed by and interpreted in accordance with the law applicable in the Province of Ontario, but expressly excluding the United Nations Convention on Contracts for the International Sale of Goods.

(Doc. No. 71 ¶ 94.) Because of the conflicting provisions in the record, the Court finds that there was not clearly an explicit or implicit agreement between the parties as to which body of law would apply.[21] See Clover, 195 F.3d at 164. Therefore, the Court will proceed to step two of

---

[21] The Court is not persuaded by Arlanxeo's argument that the Michigan choice-of-law provision was invalid due to the parties' lack of ties to Michigan. As Kaydon notes, "Kaydon first contracted with the Arlanxeo Canada's predecessors at the Sarnia facility to provide and repair Seals for the Sarnia facility compressors in 1981, while Kaydon was headquartered in

Pennsylvania's choice-of-law rules. See Atl. Pier Assocs., LLC, 647 F. Supp. 2d at 486 (describing that "the Court is unable to classify these communications as an agreement to apply New Jersey law. Accordingly, the Court proceeds to Pennsylvania's choice-of-law analysis"); see also Furniture Sols. & Res. v. Symmetry Off., LLC, No. 15-cv-04774, 2015 WL 9302915, at *2 (E.D. Pa. Dec. 22, 2015) (internal quotations omitted) (stating that, "[i]f the parties disagree, the Court must analyze the various jurisdictions' laws for the relevant claims and determine whether there is an actual or real conflict between the potentially applicable laws"); Reinert v. Nationwide Ins. Co., No. 12-cv-01094, 2013 WL 1311097, at *2 (E.D. Pa. Apr. 2, 2013) (applying Pennsylvania choice-of-law rules to determine the applicable body of law, given that the "central issue in the parties' motions for partial summary judgment is whether Pennsylvania or North Carolina substantive tort law applies for purposes of determining damages"). The Court is thus directed to apply the "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court and directs courts to apply the law of the state with the most interest in the problem." See Specialty Surfaces Int'l, Inc., 609 F.3d at 229. Because the parties argue for application of either Ontario or Pennsylvania law, the Court "must first determine whether there is a true conflict between" these bodies of law. See id. at 230.

As to the breach of contract and breach of warranty claims, Kaydon states that

---

Michigan." (Doc. No. 79 at 20.) Still, the pertinent question is whether the parties implicitly or explicitly agreed upon a body of law, and the Court finds that here, they did not. Furthermore, even assuming arguendo that the Ontario provision governed, it would be unlikely to govern the negligence claim, because choice-of-law provisions that narrowly pertain to the contract itself are not to be broadly interpreted to apply to other claims. See Horrell v. ABB Enter. Software, No. 20-cv-01454, 2021 WL 1103527, at *10 (M.D. Pa. Mar. 23, 2021) (internal quotations omitted) (finding that, "as a general matter, with respect to tort claims, courts within this circuit have held that narrow choice of law provisions are generally held insufficient to encompass the contracting parties' tort claims").

"Pennsylvania has adopted the [Uniform Commercial Code] for the purpose of streamlining dealings and disputes," whereas "Ontario has no equivalent," and "Pennsylvania and Ontario differ on the recoverability of damages for breach of contract." (Doc. No. 68 at 24–25.) Arlanxeo agrees that "Ontario courts look beyond traditional principles of offer and acceptance and instead consider the full course of conduct between the parties." (Doc. No. 73 at 35.) With respect to the negligence claim, Defendant asserts that the claim is barred by the gist of the action and economic loss doctrines under Pennsylvania law. (Doc. No. 68 at 28.) Defendant cites to Amig v. County of Juniata, 432 F. Supp. 3d 481 (M.D. Pa. 2020), in which the court articulates that "the economic loss doctrine bars a plaintiff's solely economic claim via a tort action if the breached duty arises under a contract." Id. at 488 (emphasis in original); see also McMahon v. Chipotle Mexican Grill, Inc., 732 F. Supp. 3d 415, 422 (W.D. Pa. 2024) (internal quotations omitted) (stating that the "gist of the action doctrine prevents a party from pursuing a tort action for the breach of contractual duties in the absence of any separate or independent event giving rise to the tort"). By contrast, as Plaintiff states, "Ontario law permits a plaintiff to maintain concurrent claims in tort and contract." (Doc. No. 73 at 59.)

In accordance with the foregoing, the Court finds that there is a true conflict between the two bodies of law as to each claim because the interests of both jurisdictions would be adversely affected by application of the other's law. See Hammersmith, 480 F.3d at 230 (cleaned up) (stating that a "deeper choice of law analysis is necessary only if both jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict)"); see also Thru Tubing Sols., Inc. v. Robbins, No. 4:23-cv-01476, 2023 WL 8549131, at *4 (M.D. Pa. Dec. 11, 2023) (internal quotations omitted) (stating that "laws that ultimately would produce the same result only present a false conflict").

Therefore, the Court will conduct an analysis of each jurisdiction's contacts and interests in the application of its law with respect to each claim. See Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006) (stating that, "[b]ecause choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case"). As stated above, in regard to Plaintiff's breach of contract and warranty claims, the relevant factors include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." See Specialty Surfaces Int'l, Inc., 609 F.3d at 233–34 (quoting Restatement (Second) of Conflict of Laws § 188(2)).

Regarding factors (c) and (d), Arlanxeo's butyl rubber manufacturing facility is located in Sarnia in Ontario, Canada. (Doc. No. 64 ¶¶ 1, 18.) Kaydon's principal place of business is in Hanover, Pennsylvania. (Id. ¶ 5.) Kaydon delivered the seals to Arlanxeo's facility in Ontario. (Id. ¶ 84; Doc. No. 71 ¶ 82.) The seals failed in Ontario. (Doc. No. 64 ¶ 34.) Kaydon visited Arlanxeo's Sarnia facility after the failures. (Doc. No. 71 ¶ 42.) The parties dispute exactly when Kaydon moved from Maryland to Pennsylvania, but it is undisputed that a portion of Kaydon's work on the seals occurred at Kaydon's factory in Baltimore, Maryland before the move to Hanover, Pennsylvania. (Doc. No. 71 ¶¶ 5, 15; Doc. No. 79 at 22–23 n.6.) Kaydon states that refurbishment happened in Pennsylvania "during the majority of the contracts at issue," but notably does not claim that all of the refurbishment happened there. (Doc. No. 79 at 23 n.6.) In its reply brief, Kaydon also undercuts its argument for Pennsylvania as the place of performance and location of the subject matter of the contract. Kaydon asserts that "Kaydon's allegedly defective Seal was designed in 1981," and that "Kaydon's Seal design has not changed since 1981." (Doc. No. 79 at 28.) Kaydon was undisputedly headquartered in Michigan—not

Pennsylvania—at that time. (Doc. No. 79 at 20.) Further, Kaydon notes that "the Seals at issue were delivered based upon five Quotes and Purchase Orders" and that the "latest date for delivery in these contracts is February 1, 2020." (Doc. No. 79 at 29.) Some of the at-issue orders were fulfilled in 2015 and 2016. (Doc. No. 64 ¶¶ 82–85.) As stated in footnote 5, supra, it is undisputed that Kaydon moved from Maryland to Pennsylvania in the 2019-2020 timeframe—thus some of the at-issue orders were not fulfilled in Pennsylvania.

On balance, the Court finds that the factors weigh in favor of the application of the law of Ontario for the breach of contract and warranty claims. Factors (c) and (d) favor Arlanxeo's argument for the application of Ontario law. Whereas Kaydon's contacts are spread between Pennsylvania, Maryland, and Michigan, Arlanxeo's are concentrated in Ontario. Factor (e) is neutral because Kaydon is located in Pennsylvania and Arlanxeo is in Ontario. Factors (a) and (b)—the place of contracting and the place of negotiation of the contract—are less conclusive given the exchange of various forms—at times virtually—at various points in time.

The analysis is similar for the negligence claim. For tort claims, courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." See Trias, 498 F. Supp. 3d at 620–21. With reference to the analysis above, and noting the similarity of the relevant factors, the Court finds that Ontario law applies to the negligence claim as well. Accordingly, the Court turns to the merits of Defendant's motion for summary judgment, starting with the breach of contract claim.

### B. Breach of Contract Claim

Under Ontario law,[22] a breach of contract claim requires "the existence of a contract and the breach of a term of that contract." See (Doc. No. 71-22 (2023 Hall Report) at 4); (Doc. No. 63-2 (McRae Report) at 4). Under Ontario law, "[a] plaintiff can succeed on a breach of contract claim without asserting damages, but where, as here, '[i]n a case where damages are sought, the proof of those damages is . . . a fundamental element of the cause of action.'" See Finvest Cap. Fund, Inc. v. Solid Box, LLC, No. 2006-cv-00296, 2021 WL 1153113, at *4 (D.N.J. Mar. 26, 2021) (quoting Rinc Consulting Inc. v. Grant Thornton LLP, 2019 ONSC 1844).[23] "Ontario law takes a highly contextualized approach in determining contract formation" and Ontario courts "do not mechanically apply the foregoing principles; in effect, our courts will not rigidly enforce the first or last set of terms where these terms are in conflict or in the absence of clear assent when reviewing the totality of the surrounding context." See (Doc. No. 63-2 (McRae Report) at 5).

[22] Under Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." See Fed. R. Civ. P. 44.1. "This rule provides courts with broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so." Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 440 (3d Cir. 1999). The parties "carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case." See id. Here, the Court relies in part on the parties' Ontario law expert reports: Defendant's expert Thomas McRae's May 14, 2025 report (Doc. No. 63-2) ("McRae Report") and his August 6, 2025 declaration (Doc. No. 79-8) ("McRae Declaration"); and Plaintiff's expert Geoff Hall's October 27, 2023 report (Doc. No. 71-22) ("2023 Hall Report"), Hall's February 2, 2024 report (Doc. No. 71-15) ("2024 Hall Report"), and Hall's July 9, 2025 declaration (Doc. No. 71-26) ("Hall Declaration").

[23] Plaintiff asserts that "[d]amages are not an element of the cause of action" in Ontario, (Doc. No. 73 at 44), but as cited above, the Court finds that to be an incomplete statement of the law with respect to the instant case.

> In short, Ontario courts may look to the conduct of the parties (beyond the basic principles of offer, acceptance, and consideration), including the history of the parties' contracting relationship, and the documents exchanged, including the dispositive nature of conflicting terms (and whether each party had notice of said terms—such as conflict of laws issues, or arbitration clauses), among other contextual factors.

Id. "Ontario courts examine how each party's conduct would appear to a reasonable person in the position of the other party," which is a "highly factual inquiry based on all relevant contextual factors." See (Doc. No. 71-26 (Hall Declaration) at 9) (internal quotations omitted).

Breach of contract claims (and claims for breach of warranty and negligence) are subject to Ontario's statutory limitations law: "[p]ursuant to [Section] 4 of the Ontario Limitations Act, 2002, the basic two-year limitation period applicable to most claims (including claims for breach of contract, warranty claims, and negligence claims) does not begin to run until the plaintiff's claim is discovered." See (Doc. No. 71-26 (Hall Declaration) at 3) (internal quotations omitted). In Ontario, "there is also an 'ultimate' limitation period which prohibits the commencement of a claim after the 15th anniversary of the day on which the act or omission on which the claim is based took place." (Id. at 2–3 (quoting the Ontario Limitations Act).) Further, "[u]nder Ontario law, the date of discovery or discoverability is a question of fact." See (Doc. No. 71-26 (Hall Declaration) at 6).

Regarding damages, Plaintiff asserts that it is entitled to recover under either the "transferred loss principle" or the "settlement doctrine" under Ontario law. (Doc. No. 73 at 45.) The Court thus briefly discusses each. Hall states that:

> English law has developed a principle of recovery of contract damages referred to as a "transferred loss."[24] While English law is not binding in common law provinces

[24] Hall cites to an English case, Lowick Rose LLP v. Swynson Ltd., [2017] UKSC 32, summarizing the doctrine:

> of Canada (Ontario is a common law province), English law is persuasive and is sometimes adopted into Canadian law. Such is the case with the transferred loss principle.

See (Doc. No. 71-15 (2024 Hall Report) at 8). McRae notes that "the transferred loss principle has seldom been applied in Canada and relies heavily on jurisprudence arising out of the UK," "the principle's application in Canada is hardly fleshed out," and "even UK law recognizes this as an extremely narrow exception to the general rule of recovery based on privity of contract and the plaintiff's own damages." See (Doc. No. 63-2 (McRae Report) at 14).

Next, Hall describes the "settlement doctrine" under Ontario law as providing that "A can settle with B and then claim the settlement as against C as a fair measure of A's damages, provided that the settlement with B was reasonably foreseeable by C and falls within a range of reasonable settlements at the time that it was made." See (Doc. No. 71-15 (2024 Hall Report) at 11) (internal quotations omitted). "The Settlement Doctrine applies to amounts paid as a settlement, but only where there is a reasonable settlement," and "the court is entitled to inquire

---

> 14. The principle of transferred loss is a limited exception to the general rule that a claimant can recover only loss which he has himself suffered. It applies where the known object of a transaction is to benefit a third party or a class of persons to which a third party belongs, and the anticipated effect of a breach of duty will be to cause loss to that third party.… The party recovering is accountable to the third party for any damages recovered.…
>
> 16. It is, however, important to remember that the principle of transferred loss, whether in its broader or narrower form, is an exception to a fundamental principle of the law of obligations and not an alternative to that principle. All of the modern case law on the subject emphasises that it is driven by legal necessity. It is therefore an essential feature of the principle that the recognition of a right in the contracting party to recover the third party's loss should be necessary to give effect to the object of the transaction and to avoid a "legal black hole", in which in the anticipated course of events the only party entitled to recover would be different from the only party which could be treated as suffering loss.

(Doc. No. 71-15 (2024 Hall Report) at 8.)

into the reasonability of the settlement." See (Doc. No. 79-8 (McRae Declaration) at 5).

Defendant asserts first that it is entitled to summary judgment because Arlanxeo's claim is time-barred under Ontario's two-year statutory limitations period and its ultimate 15-year rule. (Doc. No. 68 at 36.) Defendant asserts that "Ontario has a two-year statute of limitations," but that in any event, "claims for breach of contract and breach of warranty are time-barred if the act or omission on which the claim is based took place more than 15 years ago, regardless of when a plaintiff discovered her claim." (Doc. No. 68 at 33–35.) Kaydon asserts that Arlanxeo's claims are based on a defective design theory and that, because the seals were designed in 1981, each claim is thus time-barred. (Id.) Lastly, Kaydon argues that it included in its quotes a requirement that all claims be brought within one year of the date of tender or delivery, and thus the claim is time-barred under the parties' contractual agreement. (Id. at 38.)

As to whether there is a genuine dispute that Kaydon breached the parties' contractual agreements, Defendant asserts that "neither Arlanxeo Canada's Complaint nor Arlanxeo Canada's own witnesses could explain exactly how Kaydon breached the contracts at issue, which contracts were breached, or which provisions were even breached," and thus that Plaintiff "has failed to demonstrate any material facts to show that Kaydon breached the contracts at issue." (Doc. No. 68 at 40.) Kaydon makes three specific arguments in support of its motion with respect to the breach of contract claim. First, Kaydon asserts that "there is no genuine issue as to the material fact that none of the Quotes or Purchase Orders at issue in this case, nor any others in the purported relevant time period, requested Kaydon to design or re-design the Seals." (Id.) Kaydon states that "Arlanxeo Canada did not at any time contract with Kaydon to redesign the Seals to include a Babbitted bushing or otherwise." (Id. at 41.) Second, Kaydon asserts that "to the extent Arlanxeo Canada's claim is based on a theory of failure to refurbish . . . [t]here is

no evidence that Kaydon failed to refurbish and deliver the Seals as requested by Arlanxeo Canada." (Id.) Third, Kaydon argues that there is no "evidence that the Seals were not delivered by Kaydon to Arlanxeo Canada within the time allotted by the Kaydon Quotes (or the Purchase Orders)." (Id.) Finally, Defendant asserts that "Arlanxeo Canada has failed to submit any material evidence that it has incurred any damages as a result of the alleged breach, and therefore summary judgment should be granted to Kaydon on Arlanxeo Canada's breach of contract claim." (Id.)

Arlanxeo responds to Kaydon's arguments on each point. First, as to the question of whether the claim was time-barred, Arlanxeo argues that Ontario's two-year limitations period does not begin to run until the date the claim was discoverable, and that "the date of discovery or discoverability of a claim is a **question of fact** under Ontario law." (Doc. No. 73 at 32–33 (emphasis in original).) Arlanxeo argues that "it was not until Siemens issued its Root Cause Analysis report in March 2020 that ARLANXEO Canada first discovered that the Kaydon-refurbished Seals were the likely cause of the failures," and thus it "was not until that point that ARLANXEO Canada first discovered that the problems were caused by Kaydon." (Id. at 35.) Thus, "[e]ven if the March 18, 2020 date of the Siemens root cause analyses is used as the date of discovery, ARLANXEO filed its Complaint on October 29, 2021, well within the two-year limitation period." (Id. at 36.) As to Kaydon's argument that Ontario's 15-year "ultimate" limitations period also bars the claim, Arlanxeo argues that this rule "prohibits the commencement of a claim after the 15th anniversary of the day on which the 'act or omission on which the claim is based took place.'" (Id. at 38 (quoting Limitations Act 2002, s. 15).) Arlanxeo states that "in the case of a continuous act or omission, the day on which the act or omission on which the claim is based takes place is deemed to be the day on which the act or

omission ceases," and thus a court must consider, among other things, "factors such as whether the design was changed over time." (Id. at 38–39.) Arlanxeo thus argues that "Kaydon's statute of limitations affirmative defenses raise[] a myriad of factual issues that preclude summary judgment." (Id. at 41.) Regarding the claim that Kaydon's quotes included a one-year limitation, Arlanxeo asserts that the "provision appears only in Kaydon's unilaterally drafted terms and conditions, which were never provided to—or agreed to by—ARLANXEO." (Id.) Further, under Ontario law, "to resolve inconsistent contracts Ontario courts look beyond traditional principles of offer and acceptance and instead consider the full course of conduct between the parties." (Id. at 42.) Arlanxeo argues that here, "all relevant contextual factors weigh in favor of excluding the one-year limitations period." (Id.)

As to whether there is a genuine dispute of material fact with respect to Plaintiff's breach of contract claim, Plaintiff asserts that "the record demonstrates that Kaydon breached the terms of the applicable Purchase Orders in a myriad of ways." (Doc. No. 73 at 50–51.) Plaintiff argues that "Kaydon failed to timely repair, refurbish, and overhaul the seals," despite the fact that under "the Purchase Orders, Kaydon agreed to fully 'inspect,' 'assess,' 'repair,' and 'overhaul' the Seals as to be free from all defects." (Id. at 51 (quoting RSMF ¶ 88).) Plaintiff asserts that the "record contains overwhelming evidence that Kaydon's Seals provided pursuant to all five Purchase Orders were defective and unfit for use in ARLANXEO's Compressors, including expert testimony." (Id. at 52.) Plaintiff also argues that "following the initial Seal failures in October 2019, Kaydon agreed to complete emergency inspection, repair, and overhaul work to the seals," but instead, "for more than six weeks following the first Seal failure Kaydon refused to help ARLANXEO," and "Kaydon failed to send an engineer to ARLANXEO's facility until January 2020—three months after the first failure." (Id. at 51–52.) Further,

Plaintiff argues that "[m]ultiple independent experts have confirmed the existence of defects within the Seals." (Id. at 53.)

As for damages, Arlanxeo argues that it "has damages against Kaydon totaling $39,382,138," which "consist of lost profits from international sales, operational costs to investigate Kaydon's seal failures, and demurrage/utility costs incurred due to the extended outage caused by the Seal failures." (Id. at 45 (citing RSMF ¶ 99).) Arlanxeo asserts that it can recover these damages pursuant to the "transferred loss principle" and the "settlement doctrine" under Ontario law. (Id.) Arlanxeo argues that Kaydon "understood that the proper functioning of the Seals was essential to maintain ARLANXEO's production," and that it "knew or ought to have known that ARLANXEO Canada could be held liable and suffer damages if its production facilities failed." (Id. at 48.) Arlanxeo states that it ultimately "entered into a settlement agreement pursuant to which its corporate affiliates are compensated for the losses they suffered as a result of the production outages and lack of supply" and can accordingly "recover the damages incurred by ARLANXEO Singapore and ARLANXEO Switzerland." (Id.) Arlanxeo argues that these doctrines would prevent the "mischief" that Kaydon "attempt[s] to effect in this case" by causing a "legal black hole" in which Arlanxeo cannot recover on behalf of its non-party affiliates who "suffered the loss." (Id. at 45.)

In reply, Defendant argues, with respect to damages, that "**the transferred loss principle is not applied in Ontario**." (Doc. No. 79 at 31 (citing Doc. No. 79-8 (McRae Declaration) at 5).) Kaydon asserts that "Arlanxeo Canada is effectively requesting that this Honorable Court, located in Pennsylvania, create new Ontario law." (Id.) As to the "settlement doctrine," Kaydon argues that "it flatly does not apply here." (Id. at 33.) Kaydon asserts that a "fatal problem" for this argument is that "**[t]here is zero evidence that Arlanxeo Canada has paid any amount to**

**<u>the Foreign Non-Party Entities in any settlement</u>**" because "it has not made a single payment to any of the Foreign Non-Party Entities as part of a settlement related to the issues in this case." (<u>Id.</u>) As to whether Kaydon attempts "mischief," by creating a legal black hole in which Arlanxeo cannot recover, Kaydon responds that:

> Arlanxeo Canada, as the party in privity with Kaydon, could have assigned its contract/warranty claims against Kaydon to the Foreign Non-Party Entities, who then could have brought suit against Kaydon. In fact, **Arlanxeo Canada erroneously did the opposite**—choosing, incorrectly, to have the Foreign Non-Party Entities purportedly assign their nonexistent claims against Kaydon to Arlanxeo Canada. Arlanxeo Canada concedes its attempted assignment is unenforceable. Any perception by Arlanxeo Canada of a "black hole" is a merely a problem of its own creation.

(<u>Id.</u> at 10.)

Upon careful consideration of the parties' briefing, the evidence of record, and the applicable law, and construing all evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that there is a genuine dispute of material fact with respect to Plaintiff's breach of contract claim and that Defendant is not entitled to summary judgment. <u>See</u> <u>Anderson</u>, 477 U.S. at 248–49. At the outset, the Court finds that Kaydon's argument that Arlanxeo's claim is time-barred is unavailing. As to the Ontario two-year limitations period, there is a genuine dispute as to when the claim was discoverable and thus when the applicable limitations period began to run. <u>See</u> (Doc. No. 71-26 (Hall Declaration) at 3) (stating that the period "does not begin to run until the plaintiff's claim is discovered"). With regard to the "ultimate" 15-year rule, the Court is persuaded that there is at least a factual dispute regarding whether the instant conduct could constitute a "continuous act or omission," in which case "the day on which the act or omission on which the claim is based takes place is deemed to be the day on which the act or omission ceases." (Doc. No. 73 at 38–39.) Finally, given the parties'

conflicting terms and conditions forms, the Court is not persuaded that Kaydon's one-year contractual limitation was validly incorporated into the parties' contract here. See (Doc. No. 63-2 (McRae Report) at 5) (describing that Ontario courts construing contracts "will not rigidly enforce the first or last set of terms where these terms are in conflict or in the absence of clear assent when reviewing the totality of the surrounding context").

Next, the Court is persuaded that there is a genuine dispute of material fact as to whether Kaydon performed its obligations under the parties' contractual agreements. As stated above, a claim for breach of contract under Ontario law requires "the existence of a contract and the breach of a term of that contract." See (Doc. No. 71-22 (2023 Hall Report) at 4); (Doc. No. 63-2 (McRae Report) at 4). Looking, as directed by Ontario law, into "the history of the parties' contracting relationship, and the documents exchanged," (Doc. No. 63-2 (McRae Report) at 4), the Court is persuaded that the parties intended to establish contractual obligations with respect to the Kaydon quotes and Arlanxeo purchase orders. It is undisputed that the parties took steps to perform in accordance with these quotes and purchase orders. (Doc. Nos. 64 ¶¶ 79–90, 71 ¶¶ 79–90.) Kaydon issued quotes for the "repair" of seals and "refurbished" and "delivered" seals to Arlanxeo. (Doc. No. 64 ¶¶ 79–90.) At least one Arlanxeo purchase order requested the "OVERHAUL" and "REPAIR" of seals. (Doc. No. 71 ¶ 87.) One purchase order stated "URGENT – REPAIR – URGENT." (Doc. No. 71 ¶ 88.) It is undisputed that the seals failed ten times—eight times in the C2 compressor and twice in the C3 compressor. (Id. ¶ 34.) The parties dispute the cause of these failures—Kaydon asserts that "there were problems with the third-party installation of the Seals," whereas Arlanxeo asserts that "witnesses have concluded that defects within Kaydon's seals have caused the seals to fail." (Doc. Nos. 64 ¶¶ 35–39, 71 ¶¶ 35–39.) Arlanxeo also asserts that "Kaydon failed to send an engineer to ARLANXEO's facility

until January 2020—three months after the first [seal] failure." (Doc. No. 73 at 51–52.) Further, Plaintiff argues, with reference to disputed evidence of record, that "[m]ultiple independent experts have confirmed the existence of defects within the Seals." (Id. at 53 (referencing Doc. No. 71 ¶¶ 35–39).) The Court finds the above sufficient to raise a genuine dispute of material fact with respect to whether Kaydon breached any contractual obligations it had with Arlanxeo.

Although under Ontario law damages are not always an element of a breach of contract claim, "in a case where damages are sought, the proof of those damages is . . . a fundamental element of the cause of action." See Finvest Cap. Fund, Inc., 2021 WL 1153113, at *4 (cleaned up). The Court will address the parties' arguments with respect to damages. As stated above, Plaintiff asserts that it is entitled to recover under either the "transferred loss principle" or the "settlement doctrine" under Ontario law. (Doc. No. 73 at 45.)

The Court is not persuaded by Arlanxeo's arguments as to the existence or application of the transferred loss principle, and holds that the doctrine does not apply as a matter of law here. Plaintiff relies for exposition of the doctrine on a case from the United Kingdom, see (Doc. No. 71-15 (2024 Hall Report) at 8), and cites also to a case from the Court of Queen's Bench of Alberta, Polar Developments Ltd. v. Metropolitan Trust Company of Canada, 2004 ABQB 721. In Polar:

> Polar Developments Ltd. ("**Polar**") was a real estate development company. It incorporated a subsidiary, Polar Food and Drugs Ltd. ("**Polar Foods**"), for the purpose of operating a grocery store that was designed and was being developed by Polar. Polar alleged that it had entered into an agreement with Metropolitan Trust Company of Canada ("**Met**") to provide financing for equipment for the grocery store. The court concluded that there was no agreement, but that if there had been an agreement Polar could have enforced the claims that could properly be brought by Polar Foods.

See (Doc. No. 71-15 (2024 Hall Report) at 8). The Court first notes that English law and cases

from different provinces in Canada are not binding on Ontario courts. See id.; (Doc. No. 63-2 (McRae Report) at 14). Further, the Court finds Polar unpersuasive because the discussion of the transferred loss principle appears to be dicta, given that the "court concluded that there was no agreement." See id.

The Ontario cases cited in the 2023 Hall Report are also unconvincing. As McRae notes, "[n]either decision is a decision of the Court of Appeal for Ontario, or the Supreme Court of Canada, which courts' decisions are binding in Ontario." See (Doc. No. 63-2 (McRae Report) at 15). One of the cases does not even mention the term transferred loss. See Canadian Federation of Students v. Cape Breton University Students' Union, 2015 ONSC 4093. McRae describes the case as instead involving a "common law approach to commercial affairs of a group of related companies, in a piercing of the corporate veil type of scenario." See (Doc. No. 63-2 (McRae Report) at 15). The other case, Dolgonos, weighed in only insofar as to "comment that a party could possibly sue to the benefit of a third party, in appropriate circumstances, without holding that it was applicable in that case." See (Doc. No. 79-8 (McRae Declaration) at 5) (citing Dolgonos v Scotia Capital Inc, 2008 CanLII 30311). Arlanxeo identifies no binding authority in support of its argument.[25] This Court is authorized to apply foreign law, but will not make new law or break ground beyond where Ontario courts have gone, and the Court is unpersuaded that Ontario courts have applied the transferred loss doctrine under similar circumstances—and there is certainly no binding authority in favor of such approach. See (Doc. No. 79-8 (McRae Declaration) at 5) (concluding that "the transferred loss principle has never been genuinely

---

[25] In another case, the Supreme Court of Canada states that "insofar as courts have recognized transferred loss, it has been confined to physical damage," which is not at issue here. See Bow Valley Husky (Bermuda) Ltd. v. Saint John Shipbuilding Ltd., 1997 CarswellNfld 207.

applied in Ontario"). As the Third Circuit has stated, the parties carry the burden "of adequately proving foreign law to enable the court to apply it in a particular case." See Bel-Ray Co., 181 F.3d at 440. The Court finds Arlanxeo's effort unavailing with respect to the transferred loss principle.

Turning to the settlement doctrine, both Hall and McRae recognize its existence in Ontario, and neither foreclose the possibility of its application in a case like this one, nor does the Court find other directly contrary authority. See (Doc. No. 71-15 (2024 Hall Report) at 11); (Doc. No. 79-8 (McRae Declaration) at 5). As such, the Court rejects Kaydon's argument that the "settlement doctrine . . . flatly does not apply here." (Doc. No. 79 at 33.) The doctrine requires an "inquir[y] into the reasonability of the settlement," see (Doc. No. 79-8 (McRae Declaration) at 5), regarding which there remain disputed factual issues. Kaydon argues that Arlanxeo "has not made a single payment to any of the Foreign Non-Party Entities as part of a settlement related to the issues in this case." (Doc. No. 79 at 33.) Likewise, Kaydon asserts in its SMF that "Arlanxeo Canada's damages expert confirmed that all of [the] costs incurred by Arlanxeo Canada have already been reimbursed by Arlanxeo Singapore and Arlanxeo Switzerland." (Doc. No. 64 ¶ 106.) However, Arlanxeo disputes this assertion, stating that "ARLANXEO Canada entered into a settlement agreement pursuant to which its corporate affiliates were compensated for the losses they suffered as a result of the production outages and lack of supply caused by Kaydon's Seal failures." (Doc. No. 71 ¶ 106.) McRae notes that, in a circumstance such as this, "[n]ot only is the quantum of the settlement in issue, but also the strength of the claim including—in my view causation, proximity, remoteness and all elements that would or should normally be raised in defence of a claim." See (Doc. No. 79-8 (McRae Declaration) at 5–6). This is particularly relevant where, as here, the settling parties belong to

the same corporate structure. See id. (describing that the reasonableness inquiry is "especially important where . . . the settling parties are not dealing at arm's length but are members of the same corporate family"). In consideration of the above, the Court finds that there is a genuine dispute of material fact with respect to Plaintiff's breach of contract claim, and that Plaintiff is not foreclosed as a matter of law from recovering under the settlement doctrine. See Anderson, 477 U.S. at 248–49. The Court will accordingly deny Defendant's motion as to this claim, and turns next to an analysis of Defendant's motion for summary judgment as to Plaintiff's breach of warranty claim.

### C. Breach of Warranty

The Ontario Sale of Goods Act "applies only to contracts of sale of goods, and not contracts for service." See (Doc. No. 63-2 (McRae Report) at 6). "Section 15 of the Sale of Goods Act creates certain implied conditions as to quality or fitness, including that goods will be reasonably fit for their purpose, and will be of merchantable quality." (Doc. No. 71-22 (2023 Hall Report) at 8.) Section 15 reads as follows:

> **Implied conditions as to quality or fitness**
>
> **15** Subject to this Act and any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract of sale, except as follows:
>
> > 1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a description that it is in the course of the seller's business to supply (whether the seller is the manufacturer or not), there is an implied condition that the goods will be reasonably fit for such purpose, but in the case of a contract for the sale of a specified article under its patent or other trade name there is no implied condition as to its fitness for any particular purpose.
> >
> > 2. Where goods are bought by description from a seller who deals in goods of that description (whether the seller is the manufacturer or not), there is

> an implied condition that the goods will be of merchantable quality, but if the buyer has examined the goods, there is no implied condition as regards defects that such examination ought to have revealed.
>
> 3. An implied warranty or condition as to quality or fitness for a particular purpose may be annexed by the usage of trade.
>
> 4. An express warranty or condition does not negative a warranty or condition implied by this Act unless inconsistent therewith.

See Ontario Sale of Goods Act, R.S.O. 1990, c S.1, s 15. Further, "the [Sale of Goods Act] permits parties to exclude or vary by express agreement the implied warranties contained within the legislation." See (Doc. No. 63-2 (McRae Report) at 6). Also, "the implied warranties created by the [Sale of Goods Act] exist at the time of delivery of the product or up to a reasonable amount of time thereafter, which limitation on the warranty is a question of fact to be determined by the trier of fact." See id.

Defendant asserts that its terms and conditions "are incorporated by reference in the Quotes" and that these terms and conditions "limit Kaydon's warranties." (Doc. No. 68 at 43.) In particular, Kaydon's terms and conditions state:

> Warranty. [Kaydon] warrants the products manufactured by it to be free from defects in material and workmanship only. The extent of [Kaydon's] obligations hereunder is to either repair or replace its work or the defective products, F.O.B. [Kaydon's] plant, if returned with twelve (12) months after date of delivery. . . . THE FOREGOING STATES THE SOLE AND EXCLUSIVE WARRANTY OF [ARLANXEO CANADA] AND THE SOLE AND EXCLUSIVE WARRANTY OF [KAYDON]. THE WARRANTIES STATED IN THIS PARAGRAPH ARE IN LIEU OF ALL OTHER WARRANTIES, WRITTEN OR VERBAL, STATUTORY, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY DISCLAIMED."

(Doc. No. 64 ¶ 94.) Kaydon argues that this provision limits Arlanxeo in that its "only recourse for an alleged breach of warranty is to return the allegedly defective products within 12 months and Kaydon would either repair or replace its work and/or the defective products." (Doc. No. 68

at 44.) Kaydon argues further that "it is undisputed that Arlanxeo Canada has not suffered any damages," and that "under Ontario law, the burden is on the Plaintiff to 'establish its claim [on]…both liability and damages.'" (Doc. No. 68 at 45 (cleaned up) (quoting 2023 Hall Report at 4).)

Plaintiff argues in response that "all relevant contextual factors weigh in favor of excluding Kaydon's limitation clause," in particular because Kaydon's terms and conditions "were not attached to Kaydon's Quotes, and there is no evidence that ARLANXEO ever received or agreed to them." (Doc. No. 73 at 55.) Further, Arlanxeo asserts that "Kaydon expressly agreed that ARLANXEO's Purchase Orders and accompanying Terms and Conditions constitute the 'whole contract' between the parties." (Id. (quoting RSMF ¶ 94).) Thus, Arlanxeo argues that under its Purchase Orders, Kaydon agreed to the express warranty in Arlanxeo's terms and conditions. (Id.) The warranty provision states that:

> Seller expressly warrants that title to the Goods supplied and Work performed under this Order is free and clear of all liens and encumbrances and that all Goods supplied and Work performed under this Order will conform to the Specifications, drawings, samples, or other description furnished to or by Buyer, will be fit and sufficient for the purpose intended, will contain no contaminants, and will be of good material and workmanship and free from defect.

(Doc. No. 71 ¶ 94.) Further, Plaintiff asserts that under Section 15 of the Canadian Sale of Goods Act, there was an implied warranty "that the Seals would be fit and sufficient for the purposes intended, of good materials and workmanship, free from defect, merchantable, and fit for a particular purpose." (Doc. No. 73 at 58.) As applied here, Arlanxeo argues that "the seals failed on ten (10) separate occasions and did not meet the implied conditions as to fitness for their purpose or merchantable quality," and as such Arlanxeo "can assert valid claims for breach of warranty," and at a minimum, "there are disputed issues of material fact concerning Kaydon's

design, refurbishment, repair, and overhaul of the Seals." (Id.)

In reply, Defendant reasserts that its own warranty provision governs. (Doc. No. 79 at 40.) It further argues that "Arlanxeo Canada has conceded that it has not suffered any damages," and thus Kaydon "is entitled to summary judgment on Arlanxeo Canada's breach of warranty claim on this basis" because neither the "purported transferred loss principle [or the] settlement doctrine . . . is applied in Ontario." (Id.)

Upon careful consideration of the parties' briefs, the evidence of record, and the applicable law, and construing all evidence of record in the light most favorable to Plaintiff, the non-moving party, the Court finds that Defendant is not entitled to summary judgment with respect to Plaintiff's claim for breach of warranty. The parties exchanged terms and conditions with conflicting warranties. (Doc. Nos. 64 ¶ 94, 71 ¶ 94.) Each now asserts that its own should govern. Kaydon asserts that Arlanxeo "never objected to the inclusion of" its warranty provision. (Doc. No. 79 at 39 n.15.) In so arguing, Kaydon does not assert that Kaydon objected to the inclusion of Arlanxeo's warranty provision, and it is not clear why one failure to object should be treated as dispositive and the other should be disregarded. For its part, Arlanxeo asserts unconvincingly that it never received Kaydon's terms and conditions despite, as Kaydon states, "the many emails produced by Arlanxeo Canada itself that contain Kaydon's Terms and Conditions." (Doc. No. 79 at 39 (citing Doc. Nos. 79-2–79-5).) In the face of these conflicting warranty provisions, the Court finds that neither was validly incorporated into the parties' agreements with respect to the relevant quotes and purchase orders. See (Doc. No. 63-2 (McRae Report) at 5) (describing that Ontario courts construing contracts "will not rigidly enforce the first or last set of terms where these terms are in conflict or in the absence of clear assent when reviewing the totality of the surrounding context").

However, Ontario's implied warranty applies with respect to the parties' exchange of goods. See id. (describing that "the [Sale of Goods Act] applies only to contracts of sale of goods, and not contracts for service"). The Court concludes that there is a genuine dispute of material fact as to whether Kaydon breached the Sale of Goods Act, in particular as to the following provision, which applies when:

> the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a description that it is in the course of the seller's business to supply (whether the seller is the manufacturer or not), there is an implied condition that the goods will be reasonably fit for such purpose

See Ontario Sale of Goods Act, R.S.O. 1990, c S.1, s 15. In particular, the Court is persuaded that "there are disputed issues of material fact concerning Kaydon's design, refurbishment, repair, and overhaul of the Seals." (Doc. No. 73 at 58.) For instance, Kaydon asserts that "there were problems with the third-party installation of the Seals," whereas Arlanxeo asserts that "witnesses have concluded that defects within Kaydon's seals have caused the seals to fail." (Doc. Nos. 64 ¶¶ 35–39, 71 ¶¶ 35–39.) The material facts in dispute are largely the same as those at issue with respect to the breach of contract claim, discussed above. With regard to the question of damages, and as with the breach of contract claim, supra, the Court is persuaded that the transferred loss principle does not provide recovery here as a matter of law, but that Plaintiff is not foreclosed from pursuing recovery under the settlement doctrine. Finally, the Court turns to Plaintiff's negligence claim.

**D. Negligence**

Under Ontario law:

> in order to prove negligence, the plaintiffs must establish that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the standard of care;

> (3) the plaintiff suffered damage; and (4) the damage was caused, in fact and in law, by the defendant's breach.

See (Doc. No. 71-22 (2023 Hall Report) at 5), (Doc. No. 63-2 (McRae Report) at 7). "[W]hether [the duty of care] is breached in this case is a question for a trier of fact, and not for a legal expert to determine." (Doc. No. 63-2 (McRae Report) at 7.)

> In Canada (and in Ontario) under the duty of care framework, courts apply what is known as the Anns/Cooper test, which is a two stage assessment:[]
>
> (1) Stage One: asks whether harm is reasonably foreseeable, and whether there is a relationship of proximity sufficient to justify the imposition of a duty of care.
>
> (2) Stage Two: asks whether there are any residual policy reasons to negate or limit that duty, if any.

(Id.) "In addition, Ontario law permits a plaintiff to maintain concurrent claims in tort and contract. The Gist of the Action doctrine does not exist under Ontario law." See (Doc. No. 71-26 (Hall Declaration) at 13); see also (Doc. No. 63-2 (McRae Report) at 10) (stating that "concurrent liability in contract and in tort is permitted in Canada unless the contract modifies or excludes tort duties"). However, "[c]laims for pure economic loss have been narrowly construed and carefully limited in Canadian tort law." See (Doc. No. 63-2 (McRae Report) at 8). The recognized categories of pure economic loss are:

> (1) negligent misrepresentation or performance of a service;
>
> (2) negligent supply of shoddy goods or structures; and
>
> (3) relational economic loss.

(Id.) "[T]hese categories are not exhaustive, and it is possible to recognize novel categories of pure economic loss liability." (Doc. No. 71-26 (Hall Declaration) at 13.)

Defendant argues that it is entitled to summary judgment on Plaintiff's negligence claim under Ontario law because "negligence claims for pure economic loss are narrowly construed and limited, and only attainable in circumstances not present here." (Doc. No. 68 at 48.) In particular:

> Arlanxeo Canada is seeking to recover damages based upon the purported lost profits and damages of its customers—the Foreign Non-Party Entities—who purportedly could not purchase butyl from Arlanxeo Canada as a result of the Compressor failures. Arlanxeo Canada has not pled any personal or physical injury, Arlanxeo Canada's alleged damages are purely economic losses, and, the Foreign Non-Party Entities have allegedly incurred only economic loss. Accordingly, summary judgment should be granted to Kaydon on the negligence claim under the economic loss doctrine.

(Id. at 49.)

In response, Plaintiff argues that "[u]nder Ontario's version of [the economic loss] doctrine, Kaydon's own expert concedes that there would genuine disputes of material fact regarding its application." (Doc. No. 73 at 59.) Further, Plaintiff asserts that "Ontario law expressly permits recovery in tort for certain categories of pure economic loss," including the three established categories cited above. (Id.) Plaintiff asserts that its claim falls within at least two of these categories: "negligent performance of a service and relational economic loss" and that "Kaydon's own expert acknowledges that both" of these may apply. (Id.) Still, Plaintiff further argues that these categories "are not exhaustive, and the Supreme Court of Canada has emphasized that courts may recognize novel categories of recoverable economic loss in appropriate circumstances." (Id.) Thus, Arlanxeo argues that "there are questions of material fact regarding the applicability of Ontario's version of the economic loss doctrine." (Id. at 60.)

In reply, Defendant argues that no exception to the economic loss doctrine applies here. (Doc. No. 79 at 42.) As to relational economic loss, Defendant asserts that this claim is "heavily

restrict[ed]" and limited to cases where the aggrieved party was in a joint venture relationship (or one akin to that) and where the harm resulted from physical damage to property in which the party had a proprietary interest." (Id. (citing Doc. No. 79-8 (McRae Declaration) at 8–9).) As to negligent misrepresentation or performance of a service, Defendant asserts that "a purchaser or user of a product does not have a claim in negligence to recover pure economic loss where the product is not alleged to be dangerous and which does not present any risk of harm." (Id.) Therefore, Defendant argues that, because there is "no evidence of the Seals being dangerous or present[ing] any risk of harm . . . such exceptions do not apply here." (Id. (internal quotations omitted).) Defendant asserts further that "Arlanxeo Canada omits the 'proximity analysis' required to be conducted in such cases in Ontario." (Id. (quoting Doc. No. 79-8 (McRae Declaration) at 6).)

Upon careful consideration of the parties' briefing, the evidence of record, and the applicable law, and construing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that Defendant is not entitled to summary judgment with respect to Plaintiff's negligence claim. The Court first notes that Plaintiff's negligence claim is not barred as a matter of law by the gist of the action doctrine under Ontario law. See (Doc. No. 71-26 (Hall Declaration) at 13). The Court is also unpersuaded by Defendant's argument that it is entitled to summary judgment because no exception to the economic loss doctrine applies here. Although Defendant is correct that there is no evidence of record "of the Seals being dangerous or present[ing] any risk of harm," (Doc. No. 79 at 42), that does not appear to foreclose a claim that the negligent misrepresentation or performance of a service exception could apply. Defendant cites for support to McRae's declaration, which describes that "a purchaser or user of a product does not have a claim . . . where the product is not alleged to be dangerous and which

does not present any risk of harm," but that language does not apply, on its face, to potential negligent "misrepresentation or performance of services." (Id. (citing Doc. No. 79-8 (McRae Declaration) at 8–9) (emphasis added).) Further, because the inquiry into the existence of a duty of care "is a question for a trier of fact," see (Doc. No. 63-2 (McRae Report) at 7), and because Defendant does not identify an undisputed record foreclosing the existence of a duty of care here, the Court finds that Defendant is not entitled to summary judgment as to Plaintiff's negligence claim.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion for summary judgment. (Doc. No. 63.) An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania